ALFRED F. YOERG, Trustee, Appellant, v. MARY QUAINTANCE
GENESER, Appellee.

No. 42659.

DECEMBER 11, 1934.

REHEARING DENIED MARCH 8, 1935.

Rex H. Fowler, W. Z. Proctor, and Howard Steele, for appellant.

Sloane & Sloane, for appellee.

EVANS, J.—Harper, Strauss & Co. was a copartnership, which
became bankrupt June 24, 1933. At the time the transactions in-
volved in the suit were had, the defendant was Mary Quaintance
by name and was unmarried. Since that time she acquired by mar-
riage the name of Geneser. For convenience of speech we shall
ignore the bankruptcy proceedings and the existence of the trustee
and the lengthening of the name of the defendant, and we shall
refer to the names of the parties in interest by the names under
which the transactions were had.

Harper, Strauss & Co. was a brokerage firm in the city of Des
Moines. It operated upon the Chicago Board of Trade through a

correspondent broker, Thomson & McKinnon, of Chicago. The defendant became their customer at Des Moines and opened an account with them by depositing money to cover margins. In the course of executing her orders, the brokerage firm at Des Moines exhausted her account, and gave her credit by advancing necessary funds to the correspondent broker at Chicago, amounting to $434. Though denial was made by the defendant that she ever authorized the orders which were executed by the plaintiff firm, we need give no attention to that issue. The appeal is from an order directing a verdict for the defendant. The decisive question in the case is stated in the appellant's brief as follows:

"Appellant was clearly entitled to a verdict of the jury as to whether the orders were given by appellee as well as whether the transactions sued on were in violation of the law, these being the only disputed issues of fact left in the case."

For the purpose of our discussion we shall assume that "the orders were given by appellee" and confine ourselves to the other question.

At the trial, the plaintiff firm disclosed the methods of its business, including the methods of its bookkeeping and of the forms under which orders were taken and executed. Its "Blank Form of Confirmation Slip" contains the following:

"On all marginal business we reserve the right to close transactions when margins are about exhausted without further notice, and to settle contracts in accordance with the rules and customs of the Board of Trade or exchange at the place of contract, it being understood and agreed in all trades that actual delivery is contemplated."

The books of the firm show a large number of orders executed by the firm for Mary Quaintance. All of them had been closed out on the books by mere marginal sales and without actual delivery of the grain in any case. There is no claim that any account was closed out for default of payment by the purchaser. There was no compliance at any time with the requirements of section 9904, Code, which requires the broker to disclose to the purchaser the name of the seller of the grain, or of the later purchaser of the margin. To rebut the presumption raised by section 9905, the witness, Harper, testified that, at the time of the respective sales, the brokerage firm

134

intended to deliver the grain unless they had sooner sold it prior to the date of delivery. This testimony is relied upon by the appellant as rebutting the presumption raised by section 9905 that no delivery was intended. We think the testimony is quite inadequate. It implies a right on the part of the brokerage firm to entertain an intention at the time of the purchase to make a marginal sale before the due date of delivery. This assumption is contradictory to section 9905. To sustain it as a correct assumption would work a complete evasion of that statute. If the firm could legally purchase while intending to sell the option before the due date, then the intention to sell would become the *primary* intention and the intent to make delivery would become a mere alternative resorted to as a matter of necessity and arising out of the *failure to sell*. In such a case section 9905 could serve no possible function. Under the methods of the board of trade there could be no *failure* to sell except by the wish of the holder of the option. That is to say, the broker could not fail to deal for want of a market. It is the function of the Chicago Board of Trade to furnish a daily market at some price for the commodities in which it deals. To say, therefore, that the brokerage firm intended to deliver the grain unless it failed to sell the same, is to imply that it *did not* intend to make actual delivery unless it *had* to do so as an alternative. We think that the evidence produced by the plaintiff itself discloses violation of the statute as set forth in sections 9899 to 9905. This being so, the plaintiff may not recover.

The judgment below is accordingly affirmed.

MITCHELL, C. J., and ALBERT, KINDIG, and DONEGAN, JJ., concur.